**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-1849-WJM-NRN

JOHN S. WILSON,

    Plaintiff,

v.

XIANT TECHNOLOGIES, INC.,

    Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

---

This matter is before the Court on Defendant Xiant Technologies, Inc.'s ("Xiant's") Motion to Dismiss Plaintiff John S. Wilson's Second Amended Complaint ("Motion"). (ECF No. 71.) For the reasons set forth below, the Motion is denied.

### I. BACKGROUND

Plaintiff John S. Wilson is a financial commentator, author, and former investment banker residing in Chattanooga, Tennessee; Defendant Xiant is a Colorado technology corporation located in Greeley, Colorado. (¶¶ 1, 2.)[1] On September 14, 2018, Wilson filed his original complaint against Xiant in Tennessee state court, seeking damages for breach of contract and unjust enrichment. (ECF No. 1-1.) The case was removed to the U.S. District Court for the Eastern District of Tennessee on October 11, 2018, and transferred to this Court on June 26, 2019. (ECF No. 1.) Wilson's allegations in his operative Second Amended Complaint, which the Court accepts as

---

[1] Citations to a paragraph number, without more, e.g. (¶ __), are to paragraphs in Wilson's Second Amended Complaint (ECF No. 63).

true for purposes of Xiant's Motion, are as follows.

Xiant develops LED light technology with agricultural applications, including its patented Pulsed Alternating Wavelengths System ("PAWS"). (¶ 4.) PAWS "delivers light synched with the existing abilities of photochemical[s] to increase production rates in plants and animals." (¶ 4.) Xiant initially subjected PAWS to small trials that demonstrated positive results, such as increased poultry growth rates. (¶ 5.) At that time, however, Xiant lacked the financial means required to conduct the larger-scale testing "needed to validate the company and its technologies." (¶ 6.)

In order to meet this need, on or around August 1, 2017, Jason Suntych—the co-founder, director, and chief operating officer of Xiant—contacted Wilson. (¶ 9.) Suntych and Wilson discussed Xiant's goals, the most pressing of which was generating additional revenue. (¶ 11.) Eventually, Wilson traveled to Greeley, Colorado, to meet with Suntych and Suntych's brother, the chief executive of Xiant. (¶ 12.) There, "Wilson agreed to provide consultation, marketing, business development, and sales services to Xiant." (¶ 13.) Wilson and Xiant "agreed to a compensation structure that would provide Wilson 5% commission on any paid trials and sales or license agreements." (¶ 16.)

Wilson advised Xiant that it should target Cal-Maine Foods, Inc. for funding, and Suntych was receptive to the idea. (¶¶ 19, 20.) Using his network and industry influence, Wilson made contact with Cal-Maine representatives and presented to them the benefits of Xiant's PAWS technology. (¶¶ 22, 23.) As a result of these efforts, Cal-Maine representatives met with Xiant executives in November 2017, in Wichita, Kansas. (¶ 27.)

On May 24, 2018, Xiant and Cal-Maine executed a "Memorandum of Understanding for Pilot Project, Business Relationships and Investment" ("MOU").[2] The MOU

> summarizes the principal terms of the agreement [between Xiant and Cal-Maine] concerning (I) conducting a pilot project to test the commercial viability of Xiant's [PAWS] in Cal-Maine's shell egg production facilities, (ii) Cal-Maine's investment in equity securities of Xiant, and, assuming acceptable results from the Pilot (iii) establishing other business relationships. All commitments are conditioned on the completion of due diligence, legal review and execution of definitive agreements that are satisfactory to all Parties, all of which shall be conducted and negotiated in good faith.

(ECF No. 53-2 at 1.)

The MOU also contains a provision titled "Equity Investments," which provides in relevant part:

> Simultaneously with the commencement of the Pilot, Xiant will sell to Cal-Maine shares of newly-issued Xiant Common Stock, $0.0001 par value sufficient to result in Cal-Maine owning 3% of the fully-diluted equity of Xiant, giving effect to the issuance of shares to Cal-Maine. Shares will be priced based on a post-money valuation of $150,000,000 on a fully-diluted basis.

(*Id.* at 6.)

At some point thereafter, "Cal-Maine provided an initial $4,500,000 in exchange for a paid trial, the right to license and purchase Xiant's technology at favorable rates, and exclusivity." (¶ 42.) While this deal was being finalized, Wilson was focused on "finding 'the next Cal-Maine'" for Xiant. (¶ 43.) When Wilson would inquire with

---

[2] Wilson submitted a copy of the MOU with his Second Amended Complaint. (ECF No. 53-2.) Xiant does not dispute that document's authenticity. (*See* ECF No. 65 at 10.)

3

Suntych as to the status of the Cal-Maine deal, Suntych would respond evasively. (¶¶ 44, 45.)  In August 2018, Suntych revealed the terms of the Cal-Maine deal to Wilson, and offered Wilson a one-time payment of $25,000.  (¶ 48.)  Xiant to date has refused to pay Wilson for the 5% finder's fee ($225,000) originally agreed upon.  (¶ 51.)

On October 1, 2019, Xiant filed the instant Motion to Dismiss.  (ECF No. 71.)  On October 29, 2019, Wilson filed a Response (ECF No. 77), and on November 8, 2019, Xiant filed a Reply (ECF No. 80).

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a cause of action for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III. ANALYSIS

Xiant contends that, based on the nature of the Cal-Maine deal—in particular, because (Xiant asserts) it was a securities transaction—the agreed-upon compensation structure for Wilson is unlawful. Consequently, Xiant argues, the Court may not enforce the underlying contract between Xiant and Wilson. For purposes of Xiant's Motion to Dismiss, the Court disagrees.

It is important to reiterate at the outset that the Court must accept Wilson's well-pleaded factual allegations as true. *Schneider*, 493 F.3d at 1177. Xiant suggests that the Court may consider the inconsistencies of Wilson's operative allegations with those in his previous complaints, but in this procedural posture, there simply is no authority for that proposition.[3]

Wilson alleges that he and Xiant "agreed to a compensation structure that would provide Wilson 5% commission on any paid trials and sales or license agreements." (¶ 16.) He further alleges that "Cal-Maine provided an initial $4,500,000 in exchange for a paid trial, the right to license and purchase Xiant's technology at favorable rates, and exclusivity." (¶ 42.) Were Wilson able to prove the truth of these allegations, Xiant manifestly would be liable to him, at least under a breach of contract theory, for the 5% commission on Xiant's $4,500,000 contract with Cal-Maine. Whether Wilson will be able to meet the evidentiary burden on his claims, of course, is an entirely different story—and a matter properly addressed not in a motion to dismiss, but at summary

---

[3] Xiant cites several cases addressing the evidentiary value of pleadings. (*See* ECF No. 65 at 7 n.5.) These cases are inapposite, however, in the context of a Rule 12(b)(6) motion to dismiss, where the Court must accept Wilson's well-pleaded allegations as true.

judgment or trial.

Xiant argues that, because the Cal-Maine deal was *in fact* a stock purchase and nothing else, its contract with Wilson cannot be enforced.  This argument relies on Xiant's assertion that Wilson was not a registered stockbroker or investment adviser at the relevant times, making his involvement with the Cal-Maine deal unlawful under the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1), and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3(a).  In other words, because "[c]ontracts in violation of statutory provisions are void," *Amadeus Corp v. McAllister*, 232 P.3d 107, 109 (Colo. App. 2009), Xiant contends that the Court may not enforce an agreement to pay Wilson in his capacity as a stockbroker or investment advisor on the Cal-Maine deal.

To be sure, even on Wilson's own allegations (in particular those addressing the MOU), it appears that Cal-Maine may have purchased Xiant stock as a result of Wilson's efforts.  To the extent that this is true, the Court agrees with Xiant that, if Wilson was not a registered stockbroker or investment adviser at the relevant times, he could not lawfully be compensated for his role as a stockbroker or investment advisor on the Cal-Maine deal.  However, Wilson specifically alleges that Cal-Maine paid Xiant $4,500,000 "*for a paid trial, the right to license and purchase Xiant's technology at favorable rates, and exclusivity*."   (¶ 42 (emphasis added).)  Wilson does *not* allege that *any* of the $4,500,000 payment from Cal-Maine was exchanged for any type of security.  In other words, even were the Court to infer that the Cal-Maine deal involved Wilson acting unlawfully as an unregistered stockbroker or investment adviser, taking Wilson's allegations as true, the deal also involved what is plainly not a securities transaction: an agreement for a paid trial and exclusive licensing of PAWS.

Xiant insists that, in reality, the $4,500,000 Cal-Maine paid to Xiant is entirely attributable to a stock purchase memorialized in the Common Stock and Warrant Purchase Agreement attached to Xiant's Motion. (ECF No. 65-2.) The Schedule of Purchasers associated with this document, also attached, indicates that Cal-Maine purchased $4,272,489.91 worth of Xiant stock. (*Id.* at 19.) However, even were the Court to consider this document in ruling on Xiant's Motion, taking Wilson's allegations in the light most favorable to him, the Court would be unwilling to infer what Xiant asserts that it should—that there was no additional agreement for a paid trial and exclusive licensing. The Court must accept Wilson's well-pleaded allegations as true, and Wilson has specifically alleged that Cal-Maine paid Xiant $4,500,000 for a trial and licensing of PAWS—not for shares of Xiant stock.

Again, to the extent that the parties agreed to compensate Wilson in his capacity as an unregistered stockbroker or investment adviser, the Court agrees with Xiant that such an agreement would be unenforceable. But this alone would not render unenforceable Xiant's alleged agreement to pay Wilson's commission for his role in securing a paid trial and exclusive licensing: "Where a contract contains multiple provisions, some of which cannot be legally performed, the remaining provisions are not necessarily unenforceable." *CapitalValue Advisors, LLC v. K2d, Inc.*, 321 P.3d 602, 606 (Colo. App. 2013) (citing *Reilly v. Korholz*, 320 P.2d 756, 760 (Colo. 1958)). And Xiant offers no reasons why the Court should hold unenforceable an agreement that in the ordinary course of things would be, undeniably, valid and enforceable.

While Xiant's Motion will be denied, the Court notes how drastically Wilson's allegations have changed from his original complaint (ECF No. 1-1) to the currently

operative Second Amended Complaint (ECF No. 63). Indeed, it is odd that Wilson's story seems to have changed so significantly and in such a manner as to diminish, if not eliminate, with precision, its vulnerability to Xiant's principal defense. On this record the Court has no basis to assess the factual veracity of Wilson's evolving allegations. But it will take this opportunity to remind all parties and counsel that knowing misrepresentations made to the Court may be grounds for the imposition of significant monetary and other sanctions.

## IV.  CONCLUSION

For the reasons set forth below, the Court ORDERS that Defendant Xiant's Motion to Dismiss Plaintiff Wilson's Second Amended Complaint (ECF No. 71) is DENIED.

Dated this 4th day of June, 2020.

BY THE COURT:

William J. Martínez
United States District Judge